FILED
2021 Aug-26 PM 04:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

ELECTRONICALLY FILED
7/26/2021 12:59 PM
01-CV-2021-902134.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
JACQUELINE ANDERSON SMITH, CLERK

IN THE CIRCUIT COURT FOR
JEFFERSON COUNTY ALABAMA

| | |
|---|---|
| Teresa Madkin, individually and on behalf of similarly situated individuals, ) ) ) | |
| Plaintiff, ) ) | |
| vs. ) | Case No. |
| Automation Personnel Services, Inc. ) ) | CLASS ACTION |
| Defendant. ) | |

## CLASS ACTION COMPLAINT

The Plaintiff Teresa Madkin, individually and on behalf of a class of similarly situated individuals, complains against the Defendant Automation Personnel Services as follows:

### JURISDICTION

1. The Court has diversity jurisdiction under the 28 U.S.C. § 1332(d) (Class Act Fairness Act). The proposed class consists of more than 100 individuals and some of the class members reside and/or are domiciled in States other than the state of Alabama.

### VENUE & PARTIES

2. The Plaintiff Teresa Madkin resides in Huntsville, AL. She was employed through the Defendant Automation Personnel Services.

3. The Defendant Automation Personnel Services (APS) is a staffing agency headquartered in Birmingham, AL.

## FACTUAL ALLEGATIONS

4. APS is a staffing agency with over forty (40) branch offices in eleven states. All branches are corporately owned and managed. APS's revenue has grown over the years to exceed $180 million. APS has over 37,000 contingent employees. Every year since 2012, APS has been recognized as one of the "Largest U.S. Staffing Firms" by Staffing Industry Analysts.

5. APS concentrates on specific industries where it has the greatest experience and clients have the greatest need. These industries are light industrial work, technical, contact centers (call centers), manufacturing, skilled labor and automotive.

6. All APS associates are screened to match a client's requirements. Common screening requirements include drug testing, background screening, reference checks, and employment verification. APS can also confirm the level of education and verify necessary certifications. All employees have completed an I-9 and been processed through e-verification.

7. During the screening and vetting process, APS collects from and maintains sensitive personal identifying information (PII) for each associate and/or applicant. The information collected and maintained includes, but is not limited to, social security number, driver's license number, bank account information, date of birth, email address, cell phone number and home address.

8. The Plaintiff was employed through APS. As a result of her employment through APS, the Plaintiff was required to and provided APS with sensitive personal identifying information, including but not limited to, her social security number, her driver's license number, her date of birth, her home address and telephone contacts.

## Data Breach

9. On November 24, 2020, a 440GB archive of data collected and maintained by APS was leaked on a popular hacker forum. The archive contained, among other things, corporate accounting and payroll data and personal identifying information of APS employees. The PII contained in the leaked archive was not securely encrypted.

10. The leaked archive was obtained from APS's computer systems as a result of a security breach. APS's systems were vulnerable to the type of attack launched against it because it had failed to take appropriate measures to protect the PII of the Plaintiff and similarly situated employees in its possession. For example, APS did not encrypt sensitive confidential information with a secure encryption algorithm which would have made such information inaccessible without the encryption key.

11. APS determined no later than February 3, 2021 that Plaintiff and similarly situated employees' unencrypted sensitive personal identifying information was contained in files and folders obtained in the security breach. However, APS did not notify the Plaintiff and other similarly situated employees that their PII and financial information had been accessed in the November 2020 security breach until March 17, 2021.

12.

## RULE 23 ALLEGATIONS

13. Plaintiffs seek relief on behalf of themselves and as representatives of all others who are similarly situated. Pursuant to FED. R. CIV. P. 23(a), (b)(2), (b)(3) and (c)(4), Plaintiffs seek certification of a Nationwide class defined as follows:

> All persons residing in the United States whose personally identifiable information was acquired by unauthorized persons in the data breach announced by APS in March 2021 (the "Nationwide Class"). Further, State Subclasses are defined below.

Excluded from each of the above Classes are APS and any of its affiliates, parents or subsidiaries; all persons who make a timely election to be excluded from the Class; government entities; and the judges to whom this case is assigned and their immediate family and court staff.

14. Plaintiffs hereby reserve the right to amend or modify the class definition with greater specificity or division after having had an opportunity to conduct discovery.

14. Each of the proposed Classes meets the criteria for certification under FED. R. CIV. P. 23(a), (b)(2), (b)(3) and (c)(4).

15. **Numerosity. Fed. R. Civ. P. 23(a)(1).** Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical. While the exact number of Class members is unknown to Plaintiffs at this time, the proposed Class includes 37,000 individuals whose PII was compromised in the APS Data Breach. Class members may be identified through objective means. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

16. **Commonality. Fed R. Civ. P. 23(a)(2) and (b)(3).** Consistent with Fed. R. Civ. P. 23(2)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class members. The

common questions include:

(a) Whether APS had a duty to protect PII;

(b) Whether APS knew or should have known of the susceptibility of their data security systems to a data breach;

(c) Whether APS's security measures to protect their systems were reasonable in light of the measures recommended by data security experts;

(d) Whether APS was negligent in failing to implement reasonable and adequate security procedures and practices;

(e) Whether APS's failure to implement adequate data security measures allowed the breach to occur.

(f) Whether APS's conduct, including their failure to act, resulted in or was the proximate cause of the breach of its systems, resulting in the loss of PII of Plaintiffs and Class members;

(g) Whether Plaintiffs and Class members were injured and suffered damages or other acceptable losses because of APS's failure to reasonably protect its POS systems and data network; and

(h) Whether Plaintiffs and Class members are entitled to relief.

17. **Typicality. Fed. R. Civ. P. 23(a)(3).** Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiffs' claims are typical of those of other class members. Plaintiffs had their PII compromised in the Data Breach. Plaintiffs' damages and injuries are akin to other Class members and Plaintiffs seek relief consistent with the relief of the Class.

18. **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Fed. R. Civ. P. 23(a)(4), the Plaintiff is an adequate representative of the Class because she is a member of the Class and is

committed to pursuing this matter against APS to obtain relief for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff's Counsel are competent and experienced in litigating class actions, including privacy litigation. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the Class' interests.

19. **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Fed. R. Civ. P. 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual Plaintiffs may not be sufficient to justify individual litigation. Here the damages suffered by Plaintiffs and the Class are relatively small compared to the burden and expense required to individually litigate their claims against APS, and thus, individual litigation to redress APS's wrongful conduct would be impracticable. Individual litigation by each Class member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

20. **Injunctive and Declaratory Relief.** Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2) and (c). Defendant, through its uniform conduct, has acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

21. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would

advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    (a)    Whether APS failed to timely notify the public of the Breach;

    (b)    Whether APS owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their PII;

    (c)    Whether APS's security measures were reasonable in light of data security recommendation, and other measures recommended by data security experts;

    (d)    Whether APS failed to adequately comply with industry standards amounting to negligence;

    (e)    Whether Defendant failed to take commercially reasonable steps to safeguard the PII of Plaintiffs and the Class members; and

    (f)    Whether adherence to data security recommendations and measures recommended by data security experts would have reasonably prevented the Data Breach.

22. Finally, all members of the proposed Classes are readily ascertainable. APS has access to information regarding the Data Breach, the time period of the Data Breach, and which individuals were potentially affected. Using this information, the members of the Class can be identified and their contact information ascertained for the purposes of providing notice to the Class.

**Count I**
**Negligence**
**(On behalf of Plaintiffs and the Nationwide Class, or, Alternatively, Plaintiffs and the Separate Statewide Classes)**

23. Upon accepting and storing the PII of Plaintiffs and Class Members in its computer systems and on its networks, APS undertook and owed a duty to Plaintiffs and Class members to

exercise reasonable care to secure and safeguard that information and to use commercially reasonable methods to do so. APS knew that the PII was private and confidential and should be protected as private and confidential.

24.     APS owed a duty of care not to subject Plaintiffs, along with their PII, and Class members to an unreasonable risk of harm because they were foreseeable and probable victims of any inadequate security practices.

25.     APS owed numerous duties to Plaintiffs and to members of the Nationwide Class, including the following:

(a)     To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting PII in its possession;

(b)     To protect PII using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and

(c)     To implement processes to quickly detect a data breach and to timely act on warnings about data breaches.

26.     APS also breached its duty to Plaintiffs and the Class members to adequately protect and safeguard PII by knowingly disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured PII. Furthering their dilatory practices, APS failed to provide adequate supervision and oversight of the PII with which they were and are entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted and unknown third party to gather PII of Plaintiffs and Class members, misuse the PII and intentionally disclose it to others without consent.

27. APS knew, or should have known, of the risks inherent in collecting and storing PII, the vulnerabilities of its data security systems, and the importance of adequate security. APS knew about numerous, well-publicized data breaches, including the breach at Equifax.

28. APS knew, or should have known, that their data systems and networks did not adequately safeguard Plaintiffs' and Class members' PII.

29. APS breached its duties to Plaintiffs and Class members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII of Plaintiffs and Class members.

30. As a direct and proximate result of APS's conduct, Plaintiffs and the Class suffered damages including, but not limited to: damages arising from the unauthorized charges on their debit or credit cards or on cards that were fraudulently obtained through he use of the PII of Plaintiffs and Class members; damages arising from Plaintiffs' inability to use their debit or credit cards because those cards were cancelled or otherwise rendered unusable as a result of the Data Breach and/or false or fraudulent charges stemming from the Data Breach, including, but not limited to late fee charges and foregone cash back rewards; damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports and damages from identity theft, which may take months if not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy. The nature of other forms of economic damage and injury may take years to

detect, and the potential scope can only be assessed after a thorough investigation of the facts and events surrounding the theft mentioned above.

## Count II
### Negligence Per Se
### (On Behalf of Plaintiffs and the Nationwide Class, or, Alternatively, Plaintiffs and the Separate Statewide Classes)

31. Section 5 of the FTC Act prohibits "unfair… practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as APS, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of APS's duty in this regard.

32. APS violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. APS's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, and the foreseeable consequences of a data breach at a corporation such as APS, including, specifically, the immense damages that would result to Plaintiffs and Class members. APS's violation of Section 5 of the FTC Act constitutes negligence *per se*.

33. Plaintiffs and Class members are within the class of persons the the FTC Act was intended to protect.

34. As a direct and proximate result of APS's negligence per se, Plaintiffs and the Class have suffered, and continue to suffer, injuries and damages arising from Plaintiffs' inability to use their debit or credit cards because those cards were cancelled or otherwise rendered unusable as a result of the Data Breach and/or false or fraudulent charges stemming from the Data Breach, including, but not limited to late fee charges and foregone cash back rewards; damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives

including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports and damages from identity theft, which may take months if not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy.

## Count III
### Violation of Alabama Deceptive Trade Practices Act
(ALA CODE 1975 § 8-19-1 *et seq.*)

35. Plaintiff Madkin brings this claim on behalf of himself and the Alabama Subclass. Defendant's misrepresentations, active concealment, and failures to disclose violated the Alabama Deceptive Trade Practices Act ("DTPA") in that Defendant misrepresented that its services and products were of a particular standard, quality, and/or grade when they were of another (Ala. Code § 8-19-5(7)).

36. As previously alleged, Plaintiffs and Class members entered into an implied contract that required APS to provide adequate security for the PII it collected from their payment card transactions. As previously alleged, APS owes duties of care to Plaintiffs and Class members that require it to adequately secure PII.

37. The foregoing acts and omissions of the Defendant were undertaken willfully, intentionally, and knowingly as part of its routine business.

38. Defendant's misrepresentations and omissions were material to Plaintiff Madkin and members of the Alabama Subclass, such that a reasonable person would consider them important in deciding whether to purchase Defendant's service plans and products, and had Plaintiff and members of the Alabama Subclass known the truth, they would have acted differently.

39. The conduct described herein has tremendous potential to be repeated where other

consumers similarly-situated will be treated with the same unscrupulous, unethical, unfair and deceptive acts and practices.

40. Furthermore, as alleged above, APS's failure to secure employees and client's PII violates the FTCA and therefore violates the DTPA.

41. APS knew or should have known that its computer system and data security practices were inadequate to safeguard the PII of Plaintiffs and Class members, deter hackers, and detect a breach within a reasonable time, and that the risk of a data breach was highly likely.

42. As a direct and proximate result of APS's violation of the DTPA, Plaintiffs and Class members suffered damages including, but not limited to: damages arising from the unauthorized charges on their debit or credit cards or on cards that were fraudulently obtained through the use of the PII of Plaintiffs and Class Members; damages arising from Plaintiffs' inability to use their debit or credit cards or accounts because those cards or accounts were cancelled, suspended, or otherwise rendered unusable as a result of the Data Breach and/or false or fraudulent charges stemming from the Data Breach, including but not limited to late fees charges and foregone cash back rewards; damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports and damages from identity theft, which may take months if not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy. The nature of other forms of economic damage and injury may take years to detect, and the potential scope can only be assessed after a thorough investigation of the facts and events surrounding the theft mentioned above.

43. Also as a direct result of APS's knowing violation of the DTPA, Plaintiffs and Class members are entitled to damages as well as injunctive relief, including, but not limited to:

(a) Ordering that APS engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on APS's systems on a periodic basis, and ordering APS to promptly correct any problems or issues detected by such third-party security auditors;

(b) Ordering that APS engage third-party security auditors and internal personnel to run automated security monitoring;

(c) Ordering that APS audit, test, and train its security personnel regarding any new or modified procedures;

(d) Ordering that APS segment PII by, among other things, creating firewalls and access controls so that if one area of APS is compromised, hackers cannot gain access to other portions of APS systems;

(e) Ordering that APS purge, delete, and destroy in a reasonable secure manner PII not necessary for its provisions of services;

(f) Ordering that APS conduct regular database scanning and securing checks and

(g) Ordering that APS routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

44. Plaintiffs bring this action on behalf of themselves and Class Members for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiffs and Class members and the public from APS's unfair methods of competition

and unfair, deceptive, fraudulent, unconscionable and unlawful practices. APS's wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

45.     Plaintiffs and Class members are entitled to a judgment against APS for actual and consequential damages, exemplary damages and attorneys' fees pursuant to the DTPA, costs, and such other further relief as the Court deems just and proper.

Date: July 26, 2021

*Richard P. Rouco*
Richard P. Rouco

OF COUNSEL:
QUINN, CONNOR, WEAVER
 DAVIES & ROUCO, LLP
2 – 20th Street North, Suite 930
Birmingham, AL 35203
(205) 870-9989
rrouco@qcwdr.com

**PLEASE SERVE DEFENDANTS VIA CERTIFIED MAIL**:

Automation Personnel Services, Inc.
c/o Randy Watts
3500 Colonnade Parkway
Suite 500
Birmingham, AL  35243