FILED
2022 Oct-26  PM 09:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**(Southern Division)**

| | |
|---|---|
| TERESA MADKIN, individually and on behalf of similarly situated individuals, | ) ) ) ) |
| PLAINTIFF, | ) ) |
| vs. | )     Case No.: 2:21-cv-01177-CLM |
| | ) |
| AUTOMATION PERSONNEL SERVICES, INC. | )     CLASS ACTION ) |
| DEFENDANT. | ) ) |

## FIRST AMENDED CLASS ACTION COMPLAINT

The Plaintiff, Teresa Madkin, brings this action both individually and on behalf of the class of persons defined below, and complains against the Defendant Automation Personnel Services (hereinafter "APS") as follows:

### JURISDICTION AND VENUE

1. On July 26, 2021, Plaintiff filed a class action complaint against APS in the Circuit Court for Jefferson County, Alabama. On August 26, 2021, the Defendant removed Plaintiff's case to the United States District Court for the Northern District of Alabama. (Doc. No. 1) In its notice of removal, the Defendant APS averred that the amount in controversy will exceeded five million dollars ($5,000,000.00) in the aggregate. (Doc. No. 1, ¶ 14) Defendant also averred that the some of the members of the putative class are residents of States other than the State of Alabama. (Doc. No. 1, ¶ 12) Accordingly, this Court has jurisdiction over the claims asserted in this complaint under 28 U.S.C. § 1332(d).

2. This Court has personal jurisdiction over Defendant because Defendant does business in and throughout the State of Alabama, and the committed tortious acts were in the

State of Alabama and has contacts with the State of Alabama sufficient to support general jurisdiction. Defendant works with, monitors, oversees, and maintains relationships with the citizens of this state and, thus, has substantial, continuous and systematic contact with the State of Alabama.

3.    Venue is proper in this judicial district because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this district.

## PARTIES

4.    Plaintiff Teresa Madkin resides in Huntsville, AL. She used the employment placement services of APS and was employed through the Defendant, Automation Personnel Services, with a business located in Huntsville, Alabama.

5.    Defendant, Automation Personnel Services ("APS"), is an Alabama corporation staffing agency headquartered in Birmingham, AL.

## FACTUAL ALLEGATIONS

6.    APS is a staffing agency with over forty (40) branch offices in eleven states. All branches are corporately owned and managed. APS's revenue has grown over the years to exceed $180 million. APS has over 37,000 "contingent" employees, individuals that are placed with APS's employer clients. Every year since 2012, APS has been recognized as one of the "Largest U.S. Staffing Firms" by Staffing Industry Analysts.

7.    APS concentrates on specific industries where it has the greatest experience and clients have the greatest need. These industries are light industrial work, technical, contact centers (call centers), manufacturing, skilled labor and automotive.

8.    All APS associates are screened to match a client's requirements. Common screening requirements include drug testing, background screening, reference checks, and

employment verification. APS can also confirm the level of education and verify necessary certifications. All APS associates have completed an I-9 and have been processed through e-verification.

9.      During the screening and vetting process, APS collects from and maintains sensitive personal identifying information (PII) for each associate and/or applicant. The information collected and maintained includes, but is not limited to, Social Security number, driver's license number, bank account information, date of birth, email address, cell phone number and home address.

10.     Plaintiff sought employment through APS and approached APS regarding employment in the Huntsville, AL area. APS placed the Plaintiff with a Huntsville, Alabama employer. As a result of her employment through APS, Plaintiff provided APS with sensitive personal identifying information, including but not limited to, her Social Security Number, her driver's license number, her date of birth, her home address and telephone contacts. Plaintiff also provided APS with personal identifying information regarding her minor children.

11.     APS's internal guidelines clearly and unequivocally provide for protection, both physical and electronic, of all PII, providing assurance to each associate and/or applicant that their PII will be kept confidential and protected from disclosure to third parties. In fact, APS was awarded in 2019 the "Safety Standard of Excellence mark" from the American Staffing Association ("ASA"). This safety standard of excellence program was developed by ASA and the National Safety Council to promote industry-wide safety best practices. The Founder and President of APS, Stephen Nordness, accepted the award from ASA personally verifying, "The safety of our employees has always been a priority…This designation validates our efforts to provide a safe work environment for all employees." In a "Letter from the President" on the APS company

website, Mr. Nordness boasts about the same safety award, "This award recognizes our commitment to our employees to provide a safe work environment. Our organization is committed to partnering with clients who share a similar passion for safety."

### The Data Breach

12.     On November 24, 2020, a 440GB archive of data collected and maintained by APS was leaked on a popular hacker forum after APS refused to negotiate with hackers that obtained access to the data archive. The archive contained, among other things, corporate accounting and payroll data and personal identifying information of APS employees. The PII contained in the leaked archive was not securely encrypted.

13.     The leaked archive was obtained from APS's computer systems as a result of a security breach. APS's systems were vulnerable to the type of attack launched against it because it had failed to take appropriate measures to protect the PII of Plaintiff and similarly situated employees in its possession.  For example, APS did not encrypt sensitive confidential information with a secure encryption algorithm which would have made such information inaccessible without the encryption key.

14.     APS determined no later than February 3, 2021 that Plaintiff's and similarly situated unencrypted sensitive personal identifying information of employees it had placed was contained in files and folders obtained in the security breach.   However, APS did not notify Plaintiff and other similarly situated employees that their PII and financial information had been accessed in the November 2020 security breach until at least March 17, 2021.

15.     In the Notice of Data Breach that APS provided to various State Attorney Generals offices, APS conceded that unauthorized third persons accessed unencrypted files that contained sensitive information about the Plaintiff and Class members, including names, social security

number and financial account information.

16.    Though APS indicated in the Notice of Data Breach that it moved quickly to investigate and respond to this incident, assess the security of relevant systems and notify potentially affected individuals, APS has not provided details of the root cause of the Data Breach, the vulnerabilities exploited and the remedial measures undertaken to prevent a future breach. Moreover, APS did not offer to assist potentially affected individuals with managing the effects of the Data Breach.

17.    This Data Breach and the consequences the flowed from access to and exposure of unencrypted PII could have been prevented.  Upon information and belief, the Defendant did not implemented security measures recommended by Federal agencies and/or industry leading computer software and security firms.  For example, these entities recommend, among other measures, (i) implementation of an awareness and training program informing employees of the risk of cyber fraud and data breaches; (ii) enabling strong spam filters to prevent phishing emails from reaching end users and authenticating inbound email using technologies like Sender Policy Framework, Domain Message Authentication Reporting and Conformance and Domain Keys Identified Mail to prevent spoofing; (iii) using multifactor authentication and strong, randomized local admin passwords; (iv) implement software restriction policies or other controls to prevent unauthorized programs from executing from locations such as temporary folders supporting internet browsers or compression/decompression programs; (v) patch operating systems, software and firmware on all devices; (vi) configure access controls with least privilege in mind (i.e. only granting access to make changes that the user needs); (vii) set anti-virus and anti-malware programs to conduct regular scans automatically, (viii) apply latest security updates and use threat vulnerability management for internet facing assets; (ix) harden infrastructure by, among other

things, using a strong firewall program, enabling tamper protections, enabling cloud delivered protection and for MS Office applications, turning on attack surface reduction rules and (x) remove sensitive data from network when no longer needed.

18.    The measures referenced in paragraph 16 were available to the Defendant prior to the Data Breach in the fall of 2020.  Federal agencies and computer technology companies had issued warnings prior to the fall of 2020 about cyber security breaches and had warned businesses to undertake preventative measures. APS knew or had to know by the fall of 2020 that a data security breach was a substantial and real risk.

**Plaintiff Madkin and her minor children experienced identity theft in 2021**

19.    From approximately March 2016 through September 2016, the Plaintiff was placed at the Von Braun Center in Huntsville, Alabama doing janitorial work through APS.

20.    As noted above, in or around November 17, 2020, Defendant discovered a possible security breach of its operating systems. On February 3, 2021, Defendant confirmed a security breach of some personal information, including names, Social Security numbers and financial account information of individuals related to APS.

21.     Plaintiff received a letter from the Vice President of Administration of APS dated March 17, 2021 advising her personal information had been compromised due to a data breach.

22.    Plaintiff did not even realize her identity had been stolen until she was notified by APS.

23.     In or around March 2021, Plaintiff's identity was used to obtain a Chase credit card.

24.     In or around March 2021, a debit card was ordered under Plaintiff's Wells Fargo bank account without her knowledge. Plaintiff's actual debit card she used on a daily basis was turned off due to the order from an unknown person for a new card. Plaintiff was unable to purchase

needed items for her family until the newly ordered card was cancelled and the situation was corrected by her bank.

25.     In or around March 2021, Plaintiff's Food Assistance account was compromised and her account was locked, as a direct result of her and her children's data being stolen due to the Data Breach. She depended on this account to provide food for her family, and Plaintiff was unable to use her Food Assistance account for approximately two (2) to three (3) months.

26.     In or around April 2021, Plaintiff began receiving applications for credit cards, car loans and mortgages without having requested them.

27.     In or around May 2021, Plaintiff's older daughter, who is fourteen (14), received two (2) cable bills from Comcast cable. Neither Plaintiff nor her daughter subscribes to Comcast cable. Plaintiff's bank account was charged approximately thirty dollars ($30) for two (2) months for the bogus account.

28.     In or around May 2021, Plaintiff's bank account was charged for two (2) months for Hulu Streaming Services. Plaintiff was charged $6.99 twice for two (2) months, for an approximate total of $28.00.

29.     In or around May 2021, Plaintiff's youngest daughter, who is seven (7), received a referral to a rehabilitation center and nursing home in Madison, Alabama. Neither Plaintiff nor her daughter's physician or teacher referred her daughter for rehabilitation.

30.     Plaintiff has been informed by her local mail carrier she is not receiving certain pieces of mail that she has received in the past.

31.     Plaintiff has been required to change her security information at her bank, her cell phone company, and the Alabama Food Assistance Office.

32.     Plaintiff works as a caregiver for her two (2) children who require constant medical

attention. The breach of information by APS has caused Plaintiff to spend countless hours away from caring for her children on personal phone calls with representatives from Hulu, Comcast, Wells Fargo, the Huntsville Food Assistance office, as well as numerous businesses, doctor offices, and credit card companies to mitigate the significant economic damages as a result of the information breach by APS.

33.    Plaintiff was unable to use the much-needed resources from her bank account and food assistance account to provide food and necessities for her family while her accounts were closed due to the breach of information by APS. The lack of these fundamental resources caused undue economic hardship on Plaintiff and young children

### Rule 23 Class Allegations

34.    Plaintiff seeks relief on behalf of herself and as representative of all others who are similarly situated. Pursuant to ALA. R. CIV. P. 23(a), (b)(2), (b)(3) and (c)(4), Plaintiffs seek certification of a Nationwide class defined as follows:

> All persons residing in the United States whose personally identifiable information was acquired by unauthorized persons in the data breach announced by APS in March 2021 (the "Nationwide Class"). Further, State Subclasses are defined below.

Excluded from each of the above Classes are APS and any of its affiliates, parents or subsidiaries; all persons who make a timely election to be excluded from the Class; government entities; and the Judges to whom this case is assigned and their immediate family and Court staff.

35.    Plaintiff hereby reserves the right to amend or modify the class definition with greater specificity or division after having had an opportunity to conduct discovery.

36.    Each of the proposed Classes meets the criteria for certification under ALA. R. CIV. P. 23(a), (b)(2), (b)(3) and (c)(4).

37.    **Numerosity.** Consistent with Rule 23(a)(1), the members of the Class are so

numerous and geographically dispersed that the joinder of all members is impractical. While the exact number of Class members is unknown to Plaintiff at this time, the proposed Class includes 37,000 individuals whose PII was compromised in the APS Data Breach. Class members may be identified through objective means. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

38.     **Commonality.** Consistent with Rule 23(a)(2) and with Rule 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class members. The common questions include:

(a)     Whether APS had a duty to protect PII;

(b)     Whether APS knew or should have known of the susceptibility of their data security systems to a data breach;

(c)     Whether APS's security measures to protect their systems were reasonable in light of the measures recommended by data security experts;

(d)     Whether APS was negligent in failing to implement reasonable and adequate security procedures and practices;

(e)     Whether APS's failure to implement adequate data security measures allowed the breach to occur.

(f)     Whether APS's conduct, including their failure to act, resulted in or was the proximate cause of the breach of its systems, resulting in the loss of PII of Plaintiff and Class members;

(g)     Whether Plaintiffs and Class members were injured and suffered damages or other

acceptable losses because of APS's failure to reasonably protect its POS systems and data network; and

(h)    Whether Plaintiff and Class members are entitled to relief.

39.    **Typicality.** Consistent with Rule 23(a)(3), Plaintiff's claims are typical of those of other class members. Plaintiffs had their PII compromised in the Data Breach. Plaintiff's damages and injuries are akin to other Class members and Plaintiffs seek relief consistent with the relief of the Class.

40.    **Adequacy.** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Class because she is a member of the Class and is committed to pursuing this matter against APS to obtain relief for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff's Counsel are competent and experienced in litigating class actions, including privacy litigation. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the Class' interests.

41.    **Superiority.** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers when damages to an individual Plaintiff may not be sufficient to justify individual litigation. Here the damages suffered by Plaintiff and the Class are relatively small compared to the burden and expense required to individually litigate their claims against APS, and thus, individual litigation to redress APS's wrongful conduct would be impracticable. Individual litigation by each Class member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.

By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

42.    **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, has acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

43.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

(a)    Whether APS failed to timely notify the public of the Breach;

(b)    Whether APS owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;

(c)    Whether APS's security measures were reasonable in light of data security recommendation, and other measures recommended by data security experts;

(d)    Whether APS failed to adequately comply with industry standards amounting to negligence;

(e)    Whether Defendant failed to take commercially reasonable steps to safeguard the PII of Plaintiff and the Class members; and

(f)    Whether adherence to data security recommendations and measures recommended by data security experts would have reasonably prevented the Data Breach.

Finally, all members of the proposed Classes are readily ascertainable. APS has access to

information regarding the Data Breach, the time period of the Data Breach, and which individuals were potentially affected. Using this information, the members of the Class can be identified and their contact information ascertained for the purposes of providing notice to the Class.

**COUNT I**
**Negligence**
**(On behalf of Plaintiffs and the Nationwide Class, or, Alternatively, Plaintiffs and the Separate Statewide Classes)**

44.    Plaintiff restates and alleges Paragraphs 1 through 43 as if fully set forth herein.

45.    Upon accepting and storing the PII of Plaintiff and Class Members in its computer systems and on its networks, APS undertook and owed a duty to Plaintiff and Class members to exercise reasonable care to secure and safeguard that information and to use commercially reasonable methods to do so. APS knew that the PII was private and confidential and should be protected as private and confidential.

46.    APS owed a duty of care not to subject Plaintiff, along with their PII, and Class members to an unreasonable risk of harm because they were foreseeable and probable victims of any inadequate security practices.

47.    APS owed numerous duties to Plaintiff and to members of the Nationwide Class, including the following:

(a)    To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting PII in its possession;

(b)    To protect PII using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and

(c)    To implement processes to quickly detect a data breach and to timely act on warnings about data breaches.

48.    APS also breached its duty to Plaintiff and the Class members to adequately protect

and safeguard PII by knowingly disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured PII. Furthering their dilatory practices, APS failed to provide adequate supervision and oversight of the PII with which they were and are entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted and unknown third party to gather PII of Plaintiff and Class members, misuse the PII and intentionally disclose it to others without consent.

49.     APS also had a duty to exercise appropriate clearinghouse practices and to remove PII of the Plaintiff and Class Members it was no longer required to retain.  As noted above, the Plaintiff was last employed with the Von Braun center through APS in September 2016 and the data breach occurred approximately 4 years later.

50.     APS knew, or should have known, of the risks inherent in collecting and storing PII, the vulnerabilities of its data security systems, and the importance of adequate security. APS knew about numerous, well-publicized data breaches, including the breach at Equifax.

51.     Additionally, a leading human resources management organization warned in March 2020 that companies needed to "pay extra attention to securing technology their remote workforce" was using because remote access technologies are exposed to more external threats.[1]

52.     APS knew, or should have known, that their data systems and networks did not adequately safeguard Plaintiff's and Class members' PII.

53.     APS breached its duties to Plaintiff and Class members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII of Plaintiffs and Class members.

---

[1] Roy Maurer, "How to maintain cybersecurity for your remote workers," (March 26, 2020) at https://www.shrm.org/resourcesandtools/hr-topics/technology/pages/how-to-maintain-cybersecurity-for-your-remote-workers.aspx

54.     As a direct and proximate result of APS's negligence, Plaintiff and the Class have suffered and will suffer injury including, but not limited to: (a) actual identity threat;  (b) the loss of opportunity to determine how their PII is used; (c) the compromise, publication and/or conversion of their PII; (d) damages to Plaintiffs and Class members credit, costs and expenses arising from the unauthorized charges on their debit or credit cards or on cards or other transactions that were fraudulently obtained through the use of the PII of Plaintiffs and Class members; (e) damages arising from Plaintiff's inability to use  debit or credit cards because those cards were cancelled or otherwise rendered unusable as a result of the Data Breach and/or false or fraudulent charges stemming from the Data Breach; (f) losses from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, contacting businesses where fraudulent accounts were opened, closing or modifying financial or other customer accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity and (g) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosure absent implementation of necessary safeguards. The nature of other forms of economic damage and injury may take years to detect, and the potential scope can only be assessed after a thorough investigation of the facts and events surrounding the theft mentioned above.

## COUNT II
### Negligence Per Se
**(On Behalf of Plaintiffs and the Nationwide Class, or, Alternatively, Plaintiffs and the Separate Statewide Classes)**

55.     Plaintiff restates and alleges Paragraphs 1 through 43 as if fully set forth herein.

56.     Section 5 of the FTC Act prohibits "unfair… practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as

14

APS, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of APS's duty in this regard.

57.    APS violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. APS's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, and the foreseeable consequences of a data breach at a corporation such as APS, including, specifically, the damages that would result to Plaintiffs and Class members.

**APS's violation of Section 5 of the FTC Act constitutes negligence *per se*.**

58.    Plaintiffs and Class members are within the class of persons the FTC Act was intended to protect.

59.    As a direct and proximate result of APS's negligence, Plaintiff and the Class have suffered and will suffer injury including, but not limited to: (a) actual identity threat;  (b) the loss of opportunity to determine how their PII is used; (c) the compromise, publication and/or conversion of their PII; (d) damages to Plaintiffs and Class members credit, costs and expenses arising from the unauthorized charges on their debit or credit cards or on cards or other transactions that were fraudulently obtained through the use of the PII of Plaintiffs and Class members; (e) damages arising from Plaintiff's inability to use  debit or credit cards because those cards were cancelled or otherwise rendered unusable as a result of the Data Breach and/or false or fraudulent charges stemming from the Data Breach; (f) losses from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, contacting businesses where fraudulent accounts were opened, closing or modifying financial or other customer accounts, closely reviewing and monitoring their credit reports and accounts for

unauthorized activity and (g) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosure absent implementation of necessary safeguards. The nature of other forms of economic damage and injury may take years to detect, and the potential scope can only be assessed after a thorough investigation of the facts and events surrounding the theft mentioned above.

### COUNT III
### Violation of Alabama Deceptive Trade Practices Act
### (Ala Code 1975 § 8-19-1 *et seq*.)

60.    Plaintiff restates and alleges Paragraphs 1 through 43 as if fully set forth herein.

61.    Plaintiff Madkin brings this claim on behalf of herself and the Alabama Subclass. Defendant's misrepresentations, active concealment, and failures to disclose violated the Alabama Deceptive Trade Practices Act ("ADTPA") in that Defendant misrepresented that its services where of particular standard, quality, and/or grade when they were of another (Ala. Code § 8-19-5(7)).

62.    The Plaintiffs and Alabama Subclass members retained and/or entered into an agreement with APS for, among other things, employment placement services. APS is a temporary employment agency that placed Plaintiff and Subclass members with employers.  On its website, APS informed prospective applicants that the "goal is finding you a job."[2]  According to APS's website, "[o]nce you hit that submit button, the Automation Personnel team springs into action, searching for the right job for you – with the right employer on the right shift. If you're looking for full-time work or temporary job openings, we know which employers have direct hire and temporary jobs available."[3]

---

[2] APS website, Job Seekers Tab, https://www.apstemps.com/temporary-job-openings/. Last visited October 10, 2021.
[3] *Id*.

63.     As part of the services provided to Plaintiff and the Alabama Subclass, APS described the process as follows:

Submit your resume.

If your qualifications match our clients' needs, we'll invite you for an in-person interview to discuss your skills, interest and background.

We'll compare your goals and experience to the requirements of any open positions and present you with best-fit options.

You select the positions that interest you, and we present your information to our client companies.

Our recruiter will prepare you for interviews to give you the best chance of landing the offer.

We communicate with you regularly, always keeping you up to date on where you stand.

We negotiate offers and compensation for you.[4]

64.     APS informs prospective applicants that they are not required to take a position and can wait for the right job.  According to its website, "Not every job is going to meet the expectations you have. If you are not interested in a position, you are free to decline. We will continue to offer positions to you based on your skills and preferences."[5]

65.     If the placement in a full time job opening is successful, Plaintiff and Subclass members would be retained as a fulltime permanent employee of APS's employer client. Though APS informed Plaintiff and Alabama Subclass members that they paid no fee for using APS's services, the fee for matching an employee and employer is typically paid by the employer.[6]

---

[4] APS website, Job Seekers, Hiring Process Tab, https://www.apstemps.com/temporary-job-openings/. Last visited October 10, 2021.
[5] APS's Website, FAQ, "What if I'm not Interested in a Position When Offered," https://www.apstemps.com/temporary-job-openings/, last visited October 10, 2021.

[6] "As an applicant, you will not pay for any of the services Automation Personnel Services provides." FAQ, "What do I pay for Your Services" https://www.apstemps.com/temporary-job-openings/, last visited 10-11-21.

66.    As part of the contractual relationship with APS and to facilitate the employment placement services, Plaintiff and Alabama Subclass Members provided APS with PII. An implied term of this contract required APS to provide adequate security for the PII it collected from them when APS was retained as to find employment for the Plaintiffs. As previously alleged, APS owes duties of care to Plaintiffs and Alabama Subclass members that require it to adequately secure PII.

67.    The foregoing acts and omissions of the Defendant were undertaken willfully, intentionally, and knowingly as part of its routine business.

68.    Defendant's misrepresentations and omissions were material to Plaintiff Madkin and members of the Alabama Subclass, such that a reasonable person would consider them important in deciding whether to retain APS for the purpose of placing them in a job or finding employment for them. Had Plaintiff and members of the Alabama Subclass known the truth that APS took inadequate measures to protect their PII, they would have acted differently.

69.    APS knew or should have known that its computer system and data security practices were inadequate to safeguard the PII of Plaintiff and Alabama Subclass members, deter hackers, and detect a breach within a reasonable time, and that the risk of a data breach was highly likely.

70.    Plaintiff sent a written demand for relief to Defendant, which was received by Certified U.S. mail on June 26, 2021. According to ALA CODE 1975 § 8-19-10, the Defendant had fifteen (15) days to respond to said demand and did not respond.

71.    As a direct and proximate result of APS's conduct, Plaintiff and the Subclass suffered damages including, but not limited to: damages to Plaintiff and Alabama Subclass members credit, damages arising from the unauthorized charges on their debit or credit cards or

on cards or other transactions that were fraudulently obtained through the use of the PII of Plaintiff and Subclass members; damages arising from Plaintiff's inability to use her debit or credit cards because those cards were cancelled or otherwise rendered unusable as a result of the Data Breach and/or false or fraudulent charges stemming from the Data Breach, including, but not limited to late fee charges and interest; damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, contacting businesses where fraudulent accounts were opened, closing or modifying financial or other customer accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports and damages from identity theft, which may take months if not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy. The nature of other forms of economic damage and injury may take years to detect, and the potential scope can only be assessed after a thorough investigation of the facts and events surrounding the theft mentioned above.

72.    Also, as a direct result of APS's knowing violation of the ADTPA, Plaintiff and Subclass members are entitled to damages as well as injunctive relief, including, but not limited to:

(a)    Ordering that APS engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on APS's systems on a periodic basis, and ordering APS to promptly correct any problems or issues detected by such third-party security auditors;

(b)    Ordering that APS engage third-party security auditors and internal

personnel to run automated security monitoring;

(c)     Ordering that APS audit, test, and train its security personnel regarding any new or modified procedures;

(d)     Ordering that APS segment PII by, among other things, creating firewalls and access controls so that if one area of APS is compromised, hackers cannot gain access to other portions of APS systems;

(e)     Ordering that APS purge, delete, and destroy in a reasonable secure manner PII not necessary for its provisions of services;

(f)     Ordering that APS conduct regular database scanning and securing checks; and

(g)     Ordering that APS routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

73.     Plaintiff brings this action on behalf of themselves and Alabama Subclass Members for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiff and Alabama Subclass members and the public from APS's unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and unlawful practices. APS's wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

74.     Plaintiff and Alabama Subclass members are entitled to a judgment against APS for actual and consequential damages, exemplary damages and attorneys' fees pursuant to the DTPA, costs, and such other further relief as the Court deems just and proper.

<u>**COUNT IV**</u>
**(Breach of Implied Contract)**
**(On behalf of Plaintiffs and the Nationwide Class, or, Alternatively, Plaintiffs and the Separate Statewide Classes)**

75.    The Plaintiff and the Class incorporate by reference the factual allegations contained in paragraphs 1 thru 32 and 44 thru 56.

76.    In order to be employed through and placed with Defendant's employer clients, Plaintiff and Class members provided their personal and financial information. The application process also required this information in order to perform a background check.

77.    The Defendant obtained this information during the "hiring process" for the purpose of assisting and advising the Plaintiff and Class members in finding employment. Obtaining PII from the Plaintiff and Class members also aided the Defendant in negotiating "offers and compensation" for the Plaintiff and Class members.  Because the Defendant obtained PII from the Plaintiff and Class members in part to negotiate on their behalf, the parties entered into an implied contract that required Defendant to safeguard and protect such information.

78.    Defendant breached the implied contract it made with the Plaintiff and the Class members by failing to safeguard and protect their personal financial information and by failing to provide adequate, accurate and timely notice to that personal and financial information was potentially or actually accessed and/or compromised as a result of the Data Breach.

79.    As a direct and proximate result of the Defendant's breach of implied contract, Plaintiff and the Class have suffered (and will continue to suffer) ongoing, imminent and impending threat of identity theft crimes, fraud and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud and abuse resulting in monetary loss and economic harm; loss of the confidentiality of the stolen data, the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent

scrutinizing bank statements, credit card statements and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time, and other economic and non-economic harm.

80.    As a direct and proximate result of the Defendant's above described breach, Plaintiff and the Class are entitled to recover actual, consequential and nominal damages.

## COUNT V
### (Invasion of Privacy)
**(On behalf of Plaintiffs and the Nationwide Class, or, Alternatively, Plaintiffs and the Separate Statewide Classes)**

81.    The Plaintiff and Class members incorporate by reference the factual allegations contained in paragraphs 1 through 32 and 44 through 73.

82.    Plaintiff and Class members had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

83.    Defendant owed a duty to Plaintiff and Class members to keep their PII confidential.

84.    Defendant failed to protect and released to unknown and unauthorized third parties the PII of Plaintiff and Class members.

85.    Defendant's failure to protect Plaintiff and Class members' PII allowed unauthorized and unknown third parties access to and examine such information.

86.    The unauthorized release to, custody of, and examination of Plaintiff and Class member's PII is highly offensive to a reasonable person.

87.    The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and Class members disclosed their PII to the Defendant with the intention and reasonable expectation that the information would be kept confidential and protected from unauthorized

disclosure.

88.    The Data Breach into the Defendant's network constitutes an intentional interference with the Plaintiff and Class members' interest in solitude or seclusion either as to their person or personal affairs and concerns. Such interference would be highly offensive to a reasonable person.

89.    Defendant acted with a knowing or culpable state of mind when it permitted the Data Breach by knowingly conducting business and accepting the Plaintiff and Class members' PII without the implementing adequate and sufficient protective measures.

90.    Because Defendant operated its business knowing that it lacked adequate and sufficient safeguards of highly sensitive and confidential information, it had notice that its practices would cause injury and harm to the Plaintiff and the Class.

91.    As a proximate result of the Defendant's above acts and omissions, the Plaintiff and Class members' PII was disclosed to third parties without authorization, causing the Plaintiff and Class members' to suffer injury.

92.    As a direct and proximate result of Defendant's invasion of privacy, Plaintiff and Class members are entitled to recover actual, consequential and nominal damages and entitled to injunctive relief to prevent future invasions of their privacy resulting from Defendant's conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and putative Class Members, requests this Court enter an Order for the following relief against Defendant as follows:

a.    For an Order certifying the Classes, as defined herein, and appointing Plaintiff and her Counsel to represent the Nationwide Class, or, in the alternative, the separate Statewide Classes;

b.  For injunctive relief compelling APS to use appropriate cyber security methods and policies with respect to consumer data collection, storage and protection and to disclose with specificity to Class members the type of PII compromised;

c.  For an award of damages, as allowed by law in an amount to be determined;

d.  For an award of attorneys' fees, costs and litigation expenses, as allowable by law;

e.  For prejudgment interest on all amounts awarded; and

f.  Such other and further relief, including equitable, as the Court deems necessary, just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted this the 26th day of October, 2022.

/s/ Richard Rouco
Richard Rouco
QUINN, CONNOR, WEAVER,
DAVIES & ROUCO, LLP
2 – 20th Street North, Ste. 930
Birmingham, AL 35203
Telephone: 205-870-9989
Direct: 205-918-7430
rrouco@qcwdr.com

*Attorney for Plaintiffs & Putative Class*

/s/ Eric J. Artrip
Eric J. Artrip (ASBA-9673-I68E)
MASTANDO & ARTRIP, LLC
301 Washington St., Suite 302
Huntsville, AL 35801
Telephone: (256) 532-2222
artrip@mastandoartrip.com

*Attorney for Plaintiffs & Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 26th day of October 2022, a true and correct copy of the foregoing document has been served upon all counsel of record via CM/ECF.

*/s/ Eric J. Artrip*
Eric J. Artrip (ASBA-9673-I68E)